## Ten Ten Chestnut Street Corporation *v.* Quaker State Coca-Cola Bottling Co., Appellant.

Argued March 24, 1958. Before Rhodes, P. J., Gunther, Wright, Woodside, Ervin, and Watkins, JJ. (Hirt, J., absent).

*Harold A. Butz,* with him *George A. Rupp,* and *Butz, Hudders, Tallman & Rupp,* for appellant.

*E. G. Scoblionko,* with him *Maxwell E. Davidson,* and *Scoblionko & Frank,* for appellee.

OPINION BY GUNTHER, J., June 11, 1958:

This appeal is from a refusal of a motion for judgment n.o.v. after verdict was rendered in favor of plaintiff, Ten Ten Chestnut Street Corporation in a trespass action.

Plaintiff brought an action of trespass against Quaker State Coca-Cola Bottling Company for damages to its building caused, primarily, by water damage as a result of a fire which was caused by an allegedly defective part in a coca-cola vending machine owned and maintained on the premises of the plaintiff. At the trial, damages were stipulated in the amount of $4,821.07, and the only question raised on this appeal is whether, under all the circumstances, the appellant was negligent in the care and maintenance of said machine.

Plaintiff was the owner of an industrial building located at 1010 Chestnut Street in the city of Allentown, which was occupied by various tenants. The fourth floor of said building, where the vending machine was installed, was occupied by Penn Sportswear. Defendant is engaged primarily in the business of bottling and selling coca-cola beverage but also installs and maintains refrigerating and vending machines for the dispensing of said beverage. As a result of an arrangement with Penn Sportswear, defendant installed such machine in September, 1950 and placed said machine, to meet the convenience of the tenant, with its back two to three inches from a wooden partition. This partition extended just above the height of the vending machine itself.

The machine is a rectangular metal box. The upper portion contained the coca-cola bottles, a dispensing apparatus operated by coins, a cooling refrigerant and a motor to operate the dispensing device. The bottom half housed the compressor which contained the

condensing coils for liquefying the refrigerant, the starter, a motor, a fan for bringing air over the compressor and the necessary wiring. At the rear of the box, which was placed close to the wooden partition, and at its bottom, there was a small opening through which the fan drew the air into the machine. Both the lower front and the sides of the box were vented. Neither the outlet nor the extension cord for supplying electrical current were furnished by defendant.

On the morning of May 10, 1954, an employee of Penn Sportswear detected an odor resembling that of burning rubber which apparently emanated from the vending machine. He disconnected the machine from the electrical outlet and then called the service department of defendant. Defendant's employee, Alfred Mondschein, arrived on the premises at about 1:45 P.M. on the same day for the purpose of making such repairs as might be required. He opened the machine, took out the compressor unit which contained the motor, starting relay and cooling coils and examined them. After connecting the current to the machine, it still did not operate. He then jiggled the starting unit, the relay points contacted and the machine went into operation. Concluding that the floating points in the starter relay were not functioning properly, he removed them and substituted new ones. He then replaced the unit, inspected the motor, checked for leaks, checked the freon gas for pressure, checked the drain pan for oil and checked the supply of electricity in the connecting lines. He remained on the premises about a half-hour in observing the operation of the machine and then left. The machine operated in an apparently satisfactory condition for approximately the next two hours, to the time of closing of Penn Sportswear which was about 4:15 or 4:30 p.m.

On May 11, 1954, at about 3 :37 a.m., the Allentown fire department received a call concerning the leaking of water at 1010 Chestnut Street. When they arrived on the premises, they found water coming out of the building and three automatic sprinklers were operating from the ceiling of the fourth floor. The vending machine and the wooden partition immediately to its rear were burned out, the insulation burned from the extension cord leading to the vending machine and the other end thereof still connected to the electrical outlet. There was a smell of dead smoke and the time clock was stopped at 12 :00 midnight. All power lines, including the one leading to the machine were intact and the circuit breaker did not reveal any power failure. It was determined that comparatively little damage had been done to the building by fire itself but that the major portion of the damage was caused by the discharge of water from the sprinklers.

Since there were no eyewitnesses to the fire, plaintiff depended for its proof of the origin and cause of the fire upon the testimony of four expert witnesses. It was admitted that the machine was under the exclusive control of the defendant and its care and maintenance were solely its responsibility. Plaintiff's testimony established that the fire originated in the lower portion of the vending machine known as the compressor area and was caused by a loose connection or loose contact pressure in the plug attached to the starting switch. Captain F. R. Bear, who had twenty years service with the fire department, testified that he was the first to reach the scene following the fire and that as a result of an examination and facts he found, he concluded that the origin of the fire was in the lower section of the vending machine. It was he who checked for any possible power failure to determine whether a shorting in the electrical system outside of the machine

could have caused the fire. Walter J. Flores, chief of the fire department visually examined the burned out machine, took photographs of it and impounded the machine. He concluded that the origin of the fire was in the lower part of the machine because of its burned out condition and the intensity of the fire. He stated that the intensity of the combustibles that were on fire adjacent to the machine were not sufficient to transmit or radiate into the machine which, more or less, would act like a stove or a furnace, when the melting point is in the neighborhood of twelve hundred degrees Fahrenheit. He further testified that if the fire had originated outside the machine and built up any degree of heat, the sprinkler system would have extinguished the fire. George R. Bock, a master electrician for seventeen years, testified that he made a complete examination of the entire electrical system of the premises involved as well as the vending machine and found that the electrical system was in good condition in the building and that the power lines were in operation after the fire. He concluded that the fire originated in the composition plug attached to the starting switch inside the machine. Dr. A. E. Surosky, chief of the United States Testing Company, who at the time of trial was employed by Nuclear Development Corporation, testified that in his opinion the fire started at the plug on top of the starter box which was defective and not replaced by the serviceman when he checked the machine. He previously made an examination of the machine and the premises, including the partition, the power lines and the burned portions of aluminum and the molten fan. He concluded such extreme heat could not have emanated from the outside and then be sucked into the vending machine. Finally, Walter Lum, electrical engineer with General Electric Company for thirty years and with Westinghouse Elec-

tric Company for five years, testified he examined the machine and that in his opinion the fire started inside the machine. He based this conclusion on the fact that there had to be a loose connection or a source of heat sufficient to ignite the adjacent material, the cap where the motor lead was attached to the starter. The ignition temperature of the rubber "could be acquired by a loose connection, either in the prong or in the connection to the prong, which might not be loose enough to come away and open the circuit completely, but loose enough so that the normal shaking of the condensing unit as it operated would jiggle the wire and give intermittent arcing." He further stated that the arcing created oxidation on the metal, increased the heat which kept building up until the insulation was ignited. This in turn heated the compressor, raising the pressure in the refrigerant system and also heat the motor casing which raised the temperature in the thermo protecting device. The heat thus generated melted the soldered connection in the refrigerant system and the freon gas thus released atomized the oil which developed the high temperatures and burning intense enough to melt the metal.

As against this testimony, defendant produced Dr. Bewley, dean of the School of Engineering at Lehigh University, who testified that he examined the machine and performed various experiments to determine what, if anything could have caused the fire, and concluded that the fire could not have originated in the machine but from the outside. He did state, however, that he had no idea what caused the fire externally. He further stated that the freon gas he tested was not oil contaminated. The undisputed evidence disclosed that one-half pint of oil was consumed in the fire and that there was oil throughout the condensing area.

The court below permitted the case to go to the jury because the vending machine was under the exclusive control of the defendant; that the defendant knew of the defective condition of the machine and undertook to repair the same and, after repair, found no source of trouble outside the machine; that the origin and cause of the fire was established and, while the defendant came forward with an explanation of what it did in connection with the defective machine, it was for the jury, under proper instructions, to evaluate the standard of care in such a situation.

The sole question raised on this appeal is whether, under the facts as stated, the case should have been submitted to the jury and, having been submitted and a verdict returned in favor of plaintiff, whether a judgment n.o.v. should have been entered.

Having established that the fire originated in the machine, plaintiff had the right to have the question of defendant's negligence submitted to the jury. *Mack v. Reading Co.*, 377 Pa. 135, 103 A. 2d 749. There is no complaint as to the manner of submitting this case to the jury nor to the charge itself. Appellant simply contends that under the exclusive control doctrine, defendant having produced evidence to show that the repairs were done in a careful manner and that the machine thereafter operated in the normal manner, the case should not have been submitted at all. However, this contention overlooks the fact that the serviceman failed to consider the smoke and smell of burning rubber when he did inspect the machine and that he started the machine by jiggling the starter. Had he given consideration to these factors, it is entirely possible that the defect, which later developed, might have been discovered and remedied.

In *Miller v. Hickey*, 368 Pa. 317, 81 A. 2d 910, the Supreme Court, in determining whether the doctrine

of exclusive control applied, stated that these cases had to meet two tests: (a) those which are exceptional and (b) those where the evidence of the cause of the accident is not equally available to both parties but is peculiarly or exclusively accessible to and within the possession of the defendant. In the instant case, both conditions were met. In *Mack v. Reading Co.,* supra, it was held that this rule, where applicable, shifts to the defendant the burden of going forward with the evidence and that it is still upon the plaintiff to furnish proof of negligence. What is not necessary is to establish this negligence by positive testimony. The Court, in disposing of the same contention as here made, said: "Defendant contends that plaintiff failed to introduce evidence to show that the accident was one which would not ordinarily happen if due care had been used,—in other words, show that couplings do not ordinarily break in the absence of negligence in the method and frequency of inspections. Such a requirement, however, would amount to a complete negation of the very rule of 'exclusive control' since it would practically necessitate proof of negligence by positive testimony instead of permitting its inference from the circumstances attending the accident. In all the cases applying the rule the court itself determined, as a matter of common knowledge, that the nature of the occurrence was so unusual that, when it did occur, an inference would reasonably arise that it resulted from failure to exercise proper care." See also *Eckman v. Bethlehem Steel Company,* 387 Pa. 437, 128 A. 2d 70; *Maltz v. Carter,* 311 Pa. 550, 166 A. 852.

The jury, therefore, was properly called upon to decide whether the fire was such as in the ordinary course of human experience would not have happened had proper care been exercised to prevent it. It was for the jury to determine whether or not the defendant

had exercised reasonable care in the maintenance and operation of the vending machine. This is particularly so when there was no evidence produced by either side to the effect that the fire could have been caused by defective electrical connections occurring outside of the machine. Defendant, however, contends that the jury was permitted to pass on negligence based only upon the conjecture of the experts as to the origin and cause of the fire. But as stated by the court below and in which we concur, this was not conjecture but sound scientific reasoning in attempting to establish the origin and cause. See *Brueckner v. City of Pittsburgh*, 368 Pa. 554, 84 A. 2d 197.

We have examined the cases cited by appellant in support of its position and conclude that they are inapplicable to the facts of the instant case. They do not involve the doctrine of exclusive control and those which touch on this subject support our view. We find no error in the disposition made by the court below.

Judgment is affirmed.